Filed 1/9/24  In re C.M. CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re C.M. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAQUEL C.,<br><br>Defendant and Appellant. | F086710<br><br>(Super. Ct. Nos. 01CEJ300027-2, 01CEJ300027-3)<br><br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

It is ordered that the opinion herein filed on December 29, 2023, be modified as follows:

1.  On page 4, delete the fourth sentence below the heading "Six-month Review" and replace it with the following:  On April 20, 2022, the court elevated the father's status, only as to the child who is not a party to these proceedings, to presumed father, and continued the hearing.

This modification does not effect a change in the judgment.

The petition for rehearing is denied.

DETJEN, A.P.J.

WE CONCUR:

SMITH, J.

DESANTOS, J.

Filed 12/29/23  In re C.M. CA5 (unmodified opinion)

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| In re C.M. et al., Persons Coming Under the Juvenile Court Law. | |
| FRESNO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>RAQUEL C.,<br><br>Defendant and Appellant. | F086710<br><br>(Super. Ct. Nos. 01CEJ300027-2, 01CEJ300027-3)<br><br>**OPINION** |

### THE COURT*

APPEAL from orders of the Superior Court of Fresno County.  Amythest Freeman, Judge.

Lelah S. Fisher, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel C. Cederborg, County Counsel, and Lisa R. Flores, Deputy County Counsel, for Plaintiff and Respondent.

-ooOoo-

---

\*    Before Detjen, Acting P. J., Smith, J. and DeSantos, J.

**INTRODUCTION**

Raquel C. (mother) appeals from the ruling by the juvenile court on July 26, 2023, terminating her parental rights to now five-year-old C.M. and three-year-old R.M. (collectively, the children). Mother contends the juvenile court erred in failing to find the beneficial parent-child relationship exception to adoption. Anthony M. (father) also had his parental rights terminated.[1] We find no error in the juvenile court's orders and affirm the judgment.

**COMMENCEMENT OF DEPENDENCY PROCEEDINGS**

In early June 2021, mother was admitted into the hospital while she was in labor with a sibling to the children.[2] Mother tested positive for amphetamine from a urine drug screen and the Fresno County Department of Social Services (department) received a referral. Although mother had prior referrals to the department for older siblings, she had no prior referrals for the children. The children were detained on June 9, 2021. The parents tested positive for amphetamine the next day.

*Detention*

On June 14, 2021, the children were ordered detained by the juvenile court on allegations of Welfare and Institutions Code section 300, subdivisions (b)(1) and (j).[3] The court offered mother random drug testing and supervised visits twice a week. In its report for the combined jurisdiction/disposition hearing, the department advised the court mother met the criteria for a bypass of services based on her failure to treat the problems that resulted in termination of her parental rights for an older child. The department determined it was in the best interests of the children to offer mother services and

---

[1] Father is not a party to this appeal. Father's appeal in case No. F086896 is pending.

[2] This child is not a subject of the appeal.

[3] Statutory references are to the Welfare and Institutions Code.

2.

recommended the court order her to complete a parenting program, mental health, substance abuse, and domestic violence assessments as well as any recommended treatment, and random drug testing.

The department reported that mother was on probation for fraud and identity theft. Mother was enrolled in an inpatient substance abuse program she began in June 2021. The department did not recommend reunification services for father because he was only an alleged father, but should he elevate his paternity status, the department recommended bypassing him for services. Father indicated he did not want to participate in reunification services because he anticipated going to prison or into a substance abuse program.

### Jurisdiction and Disposition

On July 26, 2021, the juvenile court sustained the petition and offered mother services as recommended by the department. Mother was personally present at the hearing and represented by counsel. The disposition hearing was continued, primarily to deal with a motion pursuant to the Indian Child Welfare Act. Mother was not present at the continued hearing but was represented by counsel. The court ordered jurisdiction over the minors, services to mother including visitation, and no services to father. The court scheduled a six-month review hearing for March 9, 2022.

Mother lost contact with the department. Mother was incarcerated in Fresno County jail on February 8, 2022. The department sent a letter to mother stating the name of her social worker and requesting that she make contact as soon as possible. Mother failed to complete her parenting class. She also failed to have an assessment for substance abuse treatment. Although mother completed a mental health assessment and met the criteria for clinical treatment, she failed to participate in services and was discharged. Mother failed to make herself available to the department for a domestic violence inventory and failed to enroll into mandatory drug testing. She also cancelled visits with the children. The department found mother had failed to make significant

3.

progress in resolving the problems that led to the removal of the children from her home. The department recommended continuation of the dependency and that family reunification services be terminated for mother. The children were placed with a relative who was willing to adopt them.

### Six-month Review

Mother appeared at the six-month review hearing on March 9, 2022. County counsel requested father be elevated from alleged to presumed father status and requested a continuance to assess him for reunification services. The hearing was continued. On April 20, 2022, the court elevated father's status to presumed father and continued the hearing.

On May 16, 2022, the court found the department had complied with the case plan but mother had made no progress toward alleviating and mitigating the cause of removal as to the children. The court terminated further reunification services for mother, ordered once monthly visitation for mother, and set the case for a section 366.26 hearing to terminate the parental rights of the parents.

### Extraordinary Writ

Mother filed an extraordinary writ petition challenging the juvenile court's findings and orders. We issued our opinion rejecting mother's writ petition on August 10, 2022. (*Raquel C. v. Superior Court* (Aug. 10, 2022, F084405) [nonpub. opn.].) Mother contended the services provided were not reasonable because she did not have the proper referrals and her social worker did not communicate with her. In reviewing the record of the hearing, we found mother's testimony evasive and contradictory even while being examined by her own attorney.

Mother said the social worker failed to discuss her case plan and only communicated by text. Mother admitted, however, that she met with the social worker after the March 9, 2022 hearing and at the county jail. Mother asserted she had not had a dependency case before but later acknowledged that she did. She also acknowledged that

4.

she completed the mental health assessment. The juvenile court noted mother began participating in services after she was in jail but before that mother had limited contact with the department. We concluded there was substantial evidence to support the juvenile court's finding that reasonable services had been provided and denied her extraordinary writ petition. (*Raquel C. v. Superior Court*, *supra*, F084405.)

## SECTION 366.26 PROCEEDINGS

### *September 2022 Social Worker's Report*

The section 366.26 hearing was scheduled for September 12, 2022, and a social worker's report was prepared for the hearing. Although the department believed the permanent plan of adoption was the best plan for the sibling born in June 2021, the department sought a continuance of 120 days to determine the best permanent plan for the children.

The children had been placed with a relative care provider since their initial detention in June 2021. On April 11, 2022, they were removed from the relative because she left them unsupervised with a babysitter who was under the influence. C.M. was found wandering the street without a caretaker and was brought to a restaurant by a homeless man. The social worker was informed that the relative care provider was allowing family, including mother and father, to see the children without supervision. Further, the relative care provider was not meeting the medical, dental, mental health, emotional, and physical needs of the children.

In June 2022, mother contacted the department from jail asking to see her children. Mother told her social worker that she was trying hard to be a good mother, loved her children, and did not want them adopted. The social worker explained that due to rules at the jail, in order to contact the children mother would have to send mail or call them through the social worker. Mother said she was participating in several different classes in jail. The social worker facilitated a call between mother and the children on July 12, 2022. Mother indicated her love and C.M. responded, " 'Momma, I want to go

5.

to your house. Where [is] my Daddy?' " C.M. also said he loved mother. Mother told him he could not go to her house because she was working a lot. R.M. said " 'Hi' " to his mother but did not otherwise interact with her.

During a call on July 29, 2022, the children greeted mother. Mother sang a song to them and the children "lit up at hearing the mother." Mother tried to engage them in conversation, but they were more interested in the toys in front of them. During the next call on August 12, 2022, the children greeted mother but R.M. ran off to play without further conversation. C.M. asked where she was. Mother replied she was at work. C.M. asked mother if she could pick him up and she explained she could not yet do so.

The juvenile court granted the department's motion to continue the section 366.26 hearing. A section 366.26 report and addendum report were prepared for the continued hearing. The section 366.26 report was prepared in late December 2022. It recommended termination of parental rights for both parents and noted the children were placed in an approved home and were comfortable and happy with their care providers.

### December 2022 Section 366.26 Report

The children were removed from their relative care provider on April 11, 2022, and went to an approved foster home. The care provider, however, did not want to provide a permanent plan for the children due to their behaviors and needs. On September 14, 2022, they were placed together in another certified foster home where they have remained. Both children thrived in their new placement with a resulting reduction in their behaviors of tantrums and outbursts. The current care providers expressed their desire to provide a permanent plan of adoption for both children.

C.M. had difficulty with speech and language delays as well as developmental delays in other areas. He was referred to Central Valley Regional Center (CVRC) due to the speech and language delays. C.M. also had difficult days that included kicking, hitting, or screaming. The care providers implemented consequences including time outs and loss of toy privileges as well as explanations for his consequences. C.M. appeared to

6.

do well with these. Due to the interventions of the current care providers, the worst of C.M.'s behaviors were decreasing. R.M. was still very young and being assessed at CVRC for speech delays. In other ways, R.M. was developmentally on track.

During her incarceration, mother continued visiting with the children by phone. The social worker documented these calls twice in September 2022. The social worker tried unsuccessfully to facilitate a call or a visit to jail in October 2022.

Mother was released from jail on November 16, 2022. The social worker noted mother was appropriate during phone calls and visits but the social worker was concerned that mother was only recently released from jail. Mother was living with the maternal grandfather who had threatened to hit R.M. during a supervised visit. The social worker was concerned about unsupervised contact with the grandfather. The social worker was also concerned about mother maintaining her sobriety now that she was no longer in a structured environment.

The social worker described C.M. as generally adoptable because he is young, healthy, and has no significant auditory, visual, or developmental delays. C.M. was considered difficult to place due to behaviors that include tantrums, harming others, and screaming. He was specifically adoptable because he was placed with care providers who were willing to provide a permanent plan of adoption for him and R.M. R.M. was also considered generally adoptable because he is young without significant developmental delays. R.M. was difficult to place due to a speech impairment and behaviors associated with his inability to express himself. R.M. was specifically adoptable because he was placed with care providers who were willing to provide a permanent plan of adoption for him and C.M.

The social worker stated that the children were in need of a permanent, safe, and stable home with care providers who are able to attend to their medical, dental, developmental, and social emotional needs. Adoption would create this needed stability and permanency that both children have struggled to find since their removal and

7.

dependency. The current care providers were willing to bring permanency to both minors and were committed to helping them overcome their behavioral disturbances. A permanent plan of less than adoption, such as legal guardianship, was not an appropriate stable plan for children of the tender ages of two and four years old. The harm of severing the relationship between the children and their parents, "does not [out]weigh the security, finality, and the sense of belonging adoption would provide both [children]."

The care providers, who were considered prospective adoptive parents, have been together since 2011, married since 2014, and both were employed. They have two children of their own and have a health support system to help when needed. The prospective adoptive parents have grown very attached to the children and already think of them as part of their family, working hard to get them caught up to their ages in many respects. The prospective adoptive parents wanted to provide the children with a permanent plan of adoption as they loved the children and wanted to make sure they got the best quality of life possible while in their care. The prospective adoptive parents have had the children in their care since September 14, 2022, but began with overnight visits two weeks earlier. The prospective adoptive parents were provided with information about adoption and understand and accept the responsibilities of adopting both children.

C.M. was four years old at the time the social worker's report was prepared. Although he was not fully able to understand the intricacies of adoption, he reported that he loved his home and the room he shared with his brother, and wanted to stay with his prospective adoptive parents. R.M. was only two years old when the report was prepared and was also not able to understand the intricacies of adoption. The social worker observed R.M. to appear happy in his placement and affectionate toward his prospective adoptive parents. The social worker recommended adoption as the most appropriate permanent plan for the children and requested the termination of parental rights of both parents.

*February 2022 Addendum Report*

The February 21, 2022, addendum report still recommended adoption as the most appropriate permanent plan for the children and requested termination of both parents' parental rights. The social worker reported that the children's behaviors had improved greatly while in the placement of the care providers. This included a lessening of behaviors and improvement of their speech and communication.

Mother visited both children on January 12, 2023. When the social worker said she was going to get mother from the lobby, C.M. appeared excited. Mother brought snacks and a bag of Christmas presents. When C.M. saw dinosaurs and cars, he yelled out it was amazing and told mother he loved her so much. C.M. said the toys were perfect. Mother prepared sandwiches for the children to eat. She asked C.M. how he enjoyed Christmas. C.M. told her he cried, went to bed, and cried again. Mother told C.M. it was okay and he did not have to cry or be sad because "his mommy loved him." R.M. called mother "dad." She replied that she was his " '[m]omma' " not his dad and his dad was Anthony. R.M. repeated "[m]omma" and mother said, "yes." When mother attempted to kiss R.M. he said no and puckered his lips to kiss the air instead.

Mother brought out pictures of an older sibling and father. C.M. became sad and said he missed his father so much. Mother told C.M. that father loved him a lot. C.M. said he " 'loved you (pointing to the mother) and you (pointing to the social worker).' " As they left the visitation, R.M. held the social worker's finger and C.M. held his mother's hand. On the drive to the prospective adoptive parents' home, C.M. told the social worker that he had fun with mother. The social worker told him she was taking the children back to their prospective adoptive parents and asked him if he liked living with them. C.M. replied, " 'Yes.' " When C.M. was asked if he would be happy living there forever, C.M. said, " 'Yes, I like it there. I have a dinosaur room and food.' " C.M. said that his brother was happy there too.

9.

Once home, one of the care providers told the social worker that she had a conversation with C.M. a few days earlier and he made a statement indicating he wanted to stay in the home. The social worker stated that C.M. said the same thing to her that day. The care provider said C.M. appears to be doing well in school and is able to express his emotions. A therapist was also happy with the progress C.M. had made and would stay on as support until the dependency proceedings were over.

The social worker supervised another visit between mother and the children on February 9, 2023. When the social worker told the children that their mother had just arrived in the lobby, they did not immediately recognize her until the social worker pointed to mother. Mother brought snacks and a balloon and hugged both children. Mother told them she missed them. When they went to the visitation room, the children ran immediately to the toys in the room and began playing with them. Mother brought drinks and food from a fast food restaurant. Mother was concerned about spots in the white of R.M.'s eye and scratches on C.M.'s face. C.M. said he had been beaten up at school when a kid hit him and scratched his face. C.M. said he hit the other kid back. Mother told him that he should not hit other children and ask his teacher for help.

C.M. referred to mother by calling out " 'hey' " to her or calling her " '[t]eacher.' " Mother corrected C.M., telling him her name was " '[m]ama.' " R.M. echoed the word " '[m]ama.' " After a few minutes of playing, R.M. said he needed to use the restroom and mother assisted him. Mother gave C.M. a small photo album. C.M. pointed to pictures of himself and older siblings. C.M. saw father in a picture and said "he missed his daddy," hugging the album to himself and kissing the photo. Mother assisted the social worker in bringing the children back to the car. The children did well with the transition.

When they reached the care providers' home, the social worker helped the children out of their car seats. C.M. opened the door to the home and gave the care provider a hug and a kiss. R.M. also asked for a hug and a kiss and then ran off. C.M.

showed the care provider pictures of himself when he was little, put the album away, and went to watch television. The care provider reported that things were going well but there was an incident at school that involved C.M. fighting with another child. Although C.M. did not begin the fight, he engaged in it. The care providers were working with C.M. to ask for boundaries from other children when he is upset and to always call the teacher for help. The care provider was upset at how the school staff handled the incident. The care providers wanted C.M. to continue meeting with his therapist and were worried that his therapy was about to be closed out. The social worker said she would reach out to the therapist to see what could be done. The care providers reported that R.M. was doing very well and improving with his speech and no longer having tantrums.

In her assessment, the social worker observed that mother continued to be consistent in her visitation with the children. She interacted well with the children in their self-directed play and brought them appropriate activities for their ages. Mother has struggled when the children do not refer to her as their " 'mom' " and redirected them during their visits. After her release from jail, mother was living with her father. She has no conditions on her release from jail. The social worker was concerned about mother's housing situation as well as her ability to maintain her sobriety outside of a structured environment.

Father contacted the social worker twice by phone. He continued to be incarcerated in the Fresno County jail. The social worker could not confirm whether father participated in treatment. The social worker concluded the parents had not ameliorated the conditions that made the children dependents of the juvenile court. The department did not change its recommendations for a permanent plan of adoption for the children and termination of parental rights.

### *Contested Section 366.26 Hearing*

The contested section 366.26 hearing was continued multiple times between February and July 2023. The hearing commenced on July 24, 2023. Mother testified that she lived with father and the children, although father was incarcerated on and off. Mother was the primary caretaker for the children. When the children were detained, mother was caring for three older siblings. The children had very loving relationships with their older siblings.

Mother described her bond with the children as very strong. Mother said she "love[d] them with all my heart." Mother described her connection with the children as "inseparable." Mother would feed, clothe, and change the children. She sang them songs, played with their toys, built Legos with them, and built their train set. The children loved trains and building blocks. They would go swimming when it was hot and get ice cream.

Mother described C.M. as loving cars and being a very fast learner who could build a train set by himself. C.M. started to learn to walk at nine months and was always trying to learn something new. Mother described R.M. as quiet and loving. Mother would sing to R.M. and he would hum the melody back to her. Mother said C.M. had no behavioral issues prior to his removal except for wanting what one of his older siblings had.

Mother acknowledged that she was incarcerated between February 8, 2022, and November 16, 2022. While in custody, the social worker did not provide mother with any in-person visitation with the children. Mother talked to a social worker numerous times. The social worker visited mother in the bond room and was supposed to get visits going but never did. Mother said the jail would have allowed visitation between her and the children. Mother talked to the social worker about increasing her visits from once a month to more often. Mother also asked the social worker about sibling visits between the older siblings and the children. Sibling visitation did not occur.

Mother explained that when she saw R.M. in November 2022 he was distant but warmed up to her by the following visit. When mother visited R.M. in March 2023, he spent the majority of the visit on mother's chest while she held him. C.M. was happy during visits and asked when he could go home and about his older siblings, but mother felt as though she could not answer him.

Since mother's release from incarceration, she attended parenting classes and took as many classes as she could while in jail. Mother was a trustee in jail and had access to a tablet which allowed her to attend programs online. In addition to parenting classes, mother took classes in substance abuse, domestic violence, coping, and anger management. Mother obtained certificates for these programs. Mother continued these classes after her release from jail. At the time of the hearing, mother was still taking parenting classes and online therapy classes where she took workshops for depression and coping skills. Mother was also attending Alcoholics/Narcotics Anonymous hour-long meetings online twice a week. She had to check into these meetings and there was a tracker on her phone to keep a record of the meetings.

Mother was working by cleaning houses, doing embroidery, working at the Greek Festival, and looking for other jobs online. Although mother did not have her own housing, she had stable housing and was expecting her own housing in two months.

Mother did not believe adoption was in her children's best interests. Mother preferred the court grant legal guardianship instead. Mother said she would continue her services and to try to improve herself as a parent. Mother's long-term goal was to get her children back together. Mother said she would accomplish this by being stable financially and in her housing. Mother said she would provide for her children's needs by remaining sober and drug free.

Mother explained that for her not to see the children again would cause them emotional trauma. Mother had already seen it in her three older children and also in her grandchildren who are the same ages as C.M. and R.M. and who still cry for them.

13.

Mother believed C.M. already showed emotional damage. The children were asking for their grandfather during the last visit. Mother felt her visits with the children were positive even though they happened so fast.

Anna Harvey worked with the adoption unit for the department. Harvey had been assigned as the social worker to this case two to three weeks prior to the hearing. She observed mother during a scheduled visit to get an idea of what the parent-child relationship looked like. She scheduled contact with the care providers in their home to observe the children's interactions with them. Harvey also reviewed the case reports.

During mother's visit with the children on July 21, 2023, mother came through security and checked in at a counter in the lobby. When C.M. initially saw mother, he appeared excited and Harvey thought he was running up to see her. He was actually running over to where mother was to see a large fire truck. After viewing the truck, C.M. greeted mother.

In the visitation room, C.M. was distracted by a truck that he wanted to take home. Mother explained that the truck was another kid's toy and he could not take it. Quite a bit of time was spent during the visit with mother explaining why C.M. could not take the truck. Mother was very patient with C.M. and did a good job explaining why he could not take the truck. Mother was helping R.M. with a toy but most of the visit was focused on C.M. At the end of the visit, Harvey had a conversation with C.M. and asked him with whom he had been visiting. He replied, "that was my mom." C.M. also indicated he was excited to see his care providers and referred to them as his parents also.

Harvey observed positive interaction between C.M. and the care providers. The children were very comfortable in the care providers' residence and referred to it as home. Harvey described the children as forming a parent-child relationship, describing the care providers as their parents. Harvey believed the children were generally and specifically adoptable. Although R.M. had a speech delay, he was receiving services and because he was so young this was something that could correct itself.

Harvey did not see termination of parental rights as detrimental to the children. Harvey added that it would not be detrimental to the children to end visitations with mother and the relationship between the mother and children was not so strong that terminating it would outweigh the benefits of stability and continuity in the adoptive home. Harvey also did not think that the relationship between mother and the children was so strong that their relationship would outweigh the benefits of stability and continuity in the adoptive home. When asked whether the children viewed their mother as a friendly person or a parent, Harvey said mother was able to get the children to help clean up. Mother was able to hug and kiss the children. But as they walked out from the visit, Harvey did not see any type of emotional residue where the children were sad or upset that the visit was over. The children did not ask questions about having another visit with mother or ask when they were going to see her again. The children were excited about their toys until the care providers picked them up.

Mother's counsel argued the beneficial parent-child relationship exception to the preference for adoption applied to this case. Counsel argued that mother's incarceration interfered with visitation and that the bonds with the children could have been strengthened had she been able to visit with the children in jail. Counsel explained there was a family support system with siblings, aunts, and uncles who were part of the children's lives before they were removed from mother's custody. While mother was in jail, she had a job and attended virtual classes.

Counsel pointed out that mother was consistent with visitation. Mother's counsel complained that the current social worker was new and had not worked with the parties throughout the proceedings. There were older siblings who wanted to continue their relationship with the children. Since her release from jail, mother was working, had housing, and tried to maintain her sobriety. Counsel argued mother wanted to continue to better herself, wanted to look out for the best interests of the minors, and was willing to engage in continuing services to accomplish that goal. Counsel concluded that

15.

maintaining the parent-child relationship outweighed any benefit of adoption and would deprive the minors of substantial, positive, and very strong emotional bonds. Counsel argued it was therefore in the best interests of the children not to terminate parental rights and to choose a plan of legal guardianship or long-term foster care.

The juvenile court initially noted that it appreciated the effort Harvey put into the case even though she had only been recently assigned to handle it. The court observed that Harvey made it a point to make contact with the parties so she could offer an intelligent opinion regarding the interactions of the children with their care providers and with mother. The court found that in Harvey's testimony regarding her observations there was nothing drastically different from her observations and those of the previous social worker. Harvey observed the same types of interactions as her predecessor. In the court's opinion, both social workers did a very good job acknowledging mother's strengths as well as a lack in the bond, or not as strong of a bond with the children as mother would have the court believe.

The court stated that when mother was released from custody, she maintained regular visitation and contact. The court acknowledged that mother's incarceration may have gotten in the way of forming a bond. Although mother had regular visitation and contact after her release from custody, the burden on mother does not end there. It remained mother's burden to prove there is a relationship, the continuation of which would benefit the children such that the termination of parental rights would be detrimental to the children. The court explained it had to weigh the detriment of severing the relationship versus the benefit of adoption.

The court said there was mention of the sibling bond. Addressing this, the court stated that the sibling bond, like the parental bond exception, focuses on C.M.'s and R.M.'s bond to their siblings. The court found that even though the older children wanted a bond with their younger siblings, C.M. and R.M. did not seem to have that bond and the bond did not exist. As to the parental bond, the court noted this was much more

difficult because there was no doubt that mother loved the children. Also, the court had no doubt that both children enjoyed their visits with mother.

The court reasoned that the difficult prong was whether there is a detriment such that severing the relationship outweighs the benefit of adoption. The court described as persuasive C.M.'s reports to his social workers describing the care providers' home as his home. The court found C.M. had the stability and permanence that is supposed to be a priority for children. The law states that adoption is the preferred plan for children, especially for children of younger ages like these children. The court observed that not only did R.M. refer to the care providers as his parents, he also referred to the previous social worker as "mom." And, although R.M. knows mother is his mom, he is not very discerning with regard to his mothers.

The court further found that C.M. remembered time with his mother, even if it was marred by substance abuse. C.M. struggled when he left mother. According to the social workers, however, C.M. did not have an emotional attachment that caused trauma when ending visits with mother. The court found mother and her counsel had not met the burden of proving that the detriment of severing the relationship outweighed the benefit of adoption for the children. The court noted that in reaching this conclusion, it considered all of the reports that were prepared for hearings in September 2022, and January and March 2023. The court also considered the testimony of Harvey and the progress the children made in the home of their care providers with their behavioral issues and R.M.'s verbal abilities.

The court was aware of the sibling bond between the children and thought they were very lucky to have each other. The court found the beneficial parent-child relationship exception was not proven by the parents and accepted the department's recommendation of adoption. The court further found there was clear and convincing evidence the children were likely to be adopted and that adoption was the appropriate permanent plan for them. The court terminated the parental rights of mother and father.

17.

## BENEFICIAL PARENT-CHILD RELATIONSHP

Mother contends the detriment the children will suffer from the termination of their relationship outweighed the benefit the children will gain through adoption. Mother argues that C.M.'s words and demeanor made this apparent, and R.M., who is closely bonded to C.M., follows him in all things. Mother contends the juvenile court erred in rejecting the beneficial parent-child relationship exception to adoption as the preferred permanent plan. Both parties cite extensively to *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*).

### *Legal Criteria for Determining Beneficial Parent-Child Relationship Exception to Adoption*

"If the [juvenile] court cannot safely return a dependent child to a parent's custody within statutory time limits, the court must set a hearing pursuant to section 366.26. [Citation.] [¶] At the … hearing, the question before the court is decidedly not whether the parent may resume custody of the child." (*Caden C.*, *supra*, 11 Cal.5th at p. 630, citing *In re Amber M.* (2002) 103 Cal.App.4th 681, 690 [noting a parent must show changed circumstances to get back custody of a child during dependency proceedings].) When the court orders a section 366.26 hearing, reunification services have been terminated. The assumption is that the problems that led to the court taking jurisdiction have not been resolved. Instead, the purpose of the section 366.26 hearing is " 'specifically … to select and implement a permanent plan for the child.' " (*Caden C.*, at p. 630, citing *In re Marilyn H.* (1993) 5 Cal.4th 295, 304 and *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 250 [noting that this hearing only determines the type of permanent home].)

The statute lists plans in order of preference, providing a detailed procedure for choosing among them, to guide courts. (*Caden C.*, *supra*, 11 Cal.5th at p. 630; § 366.26, subd. (b).) Before the court can order adoption, it must terminate parental rights. (*Cynthia D. v. Superior Court*, *supra*, 5 Cal.4th at pp. 249–250; *Caden C.*, at p. 630.) If

18.

the parent shows termination of these rights would be detrimental to the child for at least one specifically enumerated reason, the court should decline termination and select another permanent plan. (*Caden C.*, at pp. 630–631.) The statutory exceptions merely permit the court, under exceptional circumstances, to choose an option other than the norm which remains adoption. (*Id*. at p. 631, citing *In re Celine R.* (2003) 31 Cal.4th 45, 53.)

When a parent establishes that one of the exceptions applies, termination of parental rights or adoption is not " 'in the best interest of the child.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) The exception at issue in this case is limited in scope. It applies where the court finds a compelling reason for determining that termination would be detrimental because the parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship. (§ 366.26, subd. (c)(1)(B)(i); *Caden C.*, at p. 631.) The *Caden C.* court discerned three elements the parent must prove to establish the exception: "(1) regular *visitation and contact*, and (2) *a relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*Caden C.*, at p. 631.)

In understanding these elements, *Caden C.* explained it was guided by the Fourth District Court of Appeal's opinion in *In re Autumn H.* (1994) 27 Cal.App.4th 567 (*Autumn H.*) (*Caden C.*, *supra*, 11 Cal.5th at p. 631.) *Caden C.* stated that *Autumn H.* set forth that "in assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Caden C.*, at p. 632; *Autumn H.*, at p. 575.) In making this decision, the trial court determines if terminating parental rights serves the best interest of the child. (*Caden C.*, at p. 632.)

The first element of regular visitation is based on whether the parents consistently visit, taking into consideration the extent permitted by court orders. Visits and contact continue or develop a significant, positive, emotional attachment from child to parent.

The second element is the court's assessment of whether the child would benefit from continuing the relationship. The slew of factors for courts to consider include the child's age, the portion of the child's life spent in the parent's custody, the child's particular needs, and the positive or negative effect of the interaction between parent and child. This assessment includes how children feel about, interact with, look to, or talk about their parents. The focus in both elements is the best interest of the child. It is not necessary or even possible to calibrate a precise quantitative measurement of the amount of love, comfort, nourishment, or physical care the parent provided during visitation. (*Caden C.*, *supra*, 11 Cal.5th at p. 632; *Autumn H.*, *supra*, 27 Cal.App.4th at pp. 575–576.)

The third element, whether termination would be detrimental to the child due to the relationship, requires the court to decide whether it would be harmful to the child to sever the relationship and choose adoption. Because terminating parental rights eliminates any legal basis for the parent or child to maintain a relationship, courts must assume termination of parental rights ends the relationship. "[C]ourts need to determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) The effects might include emotional instability, acting out, difficulties at school, insomnia, anxiety, or depression. A new, stable home may alleviate emotional instabilities and preoccupations leading to these problems. A new source of stability could make the loss of a parent not detrimental, at least on balance. (*Ibid.*)

In weighing whether termination would be detrimental, courts do not compare the parent's attributes as caregivers relative to those of any potential adoptive parent(s). There is nothing in a section 366.26 hearing allowing the child to return to live with the parent. Courts, therefore, should not look to whether the parent can provide a home for the child. The question is only whether losing the relationship with the parent "would

20.

harm the child to an extent not outweighed, on balance, by the security of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) "Even where it may never make sense to permit the child to live with the parent, termination may be detrimental." (*Ibid.*)

Understanding the harm associated with severing a parent/child relationship "is a subtle enterprise—sometimes depending on more than just how beneficial the relationship is. In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 634; *Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "A child would benefit from continuing a strong, positive, and affirming relationship, and it would be destabilizing to lose that relationship. Sometimes, though, a relationship involves tangled benefits and burdens. In those cases, the court faces the complex task of disentangling the consequences of removing those burdens along with the benefits of the relationship." (*Caden C.*, at p. 634.)

"[T]he parent asserting the parental benefit exception must show, by a preponderance of the evidence, three things": (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted" (2) "the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) "When the parent has met that burden, the parental-benefit exception applies" and the court should select a permanent plan other than adoption. (*Id.* at pp. 636–637.)

The first two elements are determined by a substantial evidence standard of review. These are factual determinations. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) Here, reviewing courts do not reweigh the evidence, evaluate the credibility of witnesses,

21.

or resolve evidentiary conflicts. The court's determinations should be upheld if supported by substantial evidence. (*Id*. at p. 640.) The third element, whether termination of parental rights would be detrimental to the child, is different because the court must engage in a delicate balancing of these determinations. This ultimate decision, "is discretionary and properly reviewed for abuse of discretion." (*Ibid*.) A court only abuses its discretion when its decision is arbitrary, capricious, or patently absurd. (*Id*. at p. 641.)

The *Caden C.* trial court found the mother had maintained regular visitation with Caden and also that his relationship with mother was beneficial. (*Caden C.*, *supra*, 11 Cal.5th at p. 641.) The Court of Appeal found there was substantial evidence to support both findings but nevertheless found the trial court abused its discretion in finding that the relationship was a compelling reason not to terminate parental rights. (*Ibid*.) One reason cited by the Court of Appeal for its holding was that mother had failed to maintain her sobriety and had not addressed her mental health issues. (*Id*. at pp. 641–642.)

*Caden C.* ruled that this was an improper consideration by the Court of Appeal. *Caden C.* found that even where a parent struggles with addiction a reasonable court could conclude that termination of parental rights would be detrimental to the child, on balance. Our Supreme Court explained the mother was not required to produce evidence in the section 366.26 hearing that she had recently attempted to maintain sobriety or sought mental health or drug addiction treatment in order to establish the beneficial parent-child relationship exception applied. "The Court of Appeal did not conclude, applying the appropriate standard of review, that the evidence showed [the m]other's substance abuse or mental health issues affected whether her relationship with Caden was beneficial or whether its loss would, on balance, be detrimental to him." (*Caden C.*, *supra*, 11 Cal.5th at p. 642.)

*Caden C.* noted that the Court of Appeal failed to "connect [the m]other's substance abuse or mental health to its emphasis on contested evidence about whether Caden's visits with [the m]other 'were often detrimental to his well-being.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 642.)  The Court of Appeal also failed to explain how its reliance on that contested evidence fit with its determination that it could not be seriously disputed that Caden had a beneficial relationship with mother, a relationship in which its termination would cause the child detriment.  The Supreme Court held the Court of Appeal's holding was error.  (*Ibid.*)

*Analysis*

Unlike the Court of Appeal in *Caden C.*, the juvenile court here did not rely on mother's addiction history in evaluating the beneficial parent-child relationship exception.  The court found that when mother was released from custody, she maintained regular visitation and contact.  The parties do not contest the court's finding that mother maintained regular visitation with the children.  The court acknowledged that mother's incarceration may have gotten in the way of forming a bond.

The only reference the court made to mother's substance abuse was in the context of C.M. having memory of living with mother as his caregiver, noting it may have been marred by her substance abuse.  It was well documented that when the children were first detained mother was struggling with a serious addiction problem.  The court, however, did not improperly rely on drug addiction as a barrier to the beneficial parent-child relationship exception as the Court of Appeal did in *Caden C.*  The court did not require mother to demonstrate sobriety as part of her burden of proof on whether severing the parent-child relationship would be detrimental to the children.  The court's reference was solely within the context of the parent-child relationship.

Although mother had regular visitation and contact after her release from custody, the court noted mother's burden of proof did not end there.  It remained mother's burden to prove there is a relationship, the continuation of which would benefit the children such

23.

that the termination of parental rights would be detrimental to the children. The court stated that both the social workers did a very good job acknowledging mother's strengths as well as a lack in the bond, or not as strong a bond with her children as mother would have the court believe. The court acknowledged there was no doubt the children enjoyed their visits with mother and that mother loved the children. For the court, however, the issue was whether there was a detriment such that severing the relationship outweighed the benefits of adoption.

We reiterate the following guidance from *Caden C*. "[C]ourts need to determine … how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Caden C*., *supra*, 11 Cal.5th at p. 633.) The effects might include emotional instability, acting out, difficulties at school, insomnia, anxiety, or depression. A new, stable home may alleviate emotional instabilities and preoccupations leading to these problems. A new source of stability could make the loss of a parent not detrimental, at least on balance. (*Ibid*.)

In assessing the children's relationship with mother, C.M. referred to the caregivers as his parents. R.M. referred to the previous social worker as "mom." The court recognized that C.M. remembered time with his mother, even if that time was marred by substance abuse. The social worker reported that when mother was released from jail, she had a supervised visit with R.M. When mother identified herself as " 'mommy,' " R.M. said no and pointed to the social worker.

The social worker reported that when mother and the maternal grandfather had a visit in December 2022, R.M. hugged his grandfather. R.M. refused a hug from mother and called the social worker " 'mommy.' " C.M. was happy to see mother and had her read him a book. C.M. kissed both sides of a picture mother gave him that showed her and a sibling on one side and father on the other side. C.M. reported on several occasions that he missed his mother and his father and would like to go to their house. While in

24.

care, the children have not asked for mother aside from when she calls them. C.M. has reported missing his father while in placement but does not ask for mother. The social worker doubted whether R.M. saw mother as a parent, and he did not appear to have a beneficial relationship with her. C.M. and R.M. would likely not be affected by the loss of a one-hour visit with mother.

During mother's visit with the children in January 2023, the social worker reported C.M. appeared excited when the social worker said she was getting mother from the lobby. Mother brought snacks and a bag of Christmas presents. C.M. said the toys were amazing and that he loved mother. Mother brought pictures of father and an older sibling. C.M. became sad and said he missed father so much. When mother told C.M. his father loved him a lot, C.M. replied that he " 'loved you (pointing to the mother) and you (pointing to the social worker).' " C.M. held mother's hand as they left the visit and told the social worker on the ride home that he had fun with mother. He also said he liked living with the prospective adoptive parents and indicated he would be happy living there forever. C.M. said his brother was happy there too. The social worker observed that the children did well with the transition back to their prospective adoptive parents. When they returned home from a February 9, 2023 visit, the children gave the care provider a hug and a kiss.

During a July 2023 visit, mother checked in at a counter in the lobby. The social worker reported that when C.M. initially saw mother, he appeared excited and the social worker thought he was running up to see mother. C.M. was actually running over to see a fire truck. After viewing the fire truck, C.M. greeted mother. During the entire visit, C.M. was distracted by a truck that he wanted to take home. Mother spent much of her time during the visit explaining to C.M. why he could not take the truck. Mother was very patient with C.M. but most of the visit was focused on him and not R.M. The social worker had a conversation with C.M. in which he indicated he was excited about his new care providers and referred to them as his parents.

At the hearing, social worker Harvey did not see termination of parental rights as detrimental to the children. Harvey added that it would not be detrimental to the children to end visitations with mother and the relationship between the mother and children was not so strong that terminating it would outweigh the benefits of stability and continuity in the adoptive home. Harvey also did not think that the relationship between mother and the children was so strong that their relationship would outweigh the benefits of stability and continuity in the adoptive home. When asked whether the children viewed their mother as a friendly person or a parent, Harvey said mother was able to get the children to help clean up. Mother was able to hug and kiss the children. But as they walked out from the visit, Harvey did not see any type of emotional residue where the children were sad or upset that the visit was over. The children did not ask questions about having another visit with mother or ask when they were going to see her again.

The foregoing summary by the social workers of mother's most recent visits with the children prior to the section 366.26 hearing support the juvenile court's observation that mother's bond with the children was not as strong as she asserted during the hearing. The mother clearly loves both children, but their bond was not of a nature that severing it would cause the children detriment. The court noted C.M. did not have an emotional attachment that caused him any trauma when visits ended even though he sometimes struggled when he left mother.

In her reply brief, mother's counsel further argues that C.M. told mother he was sad at Christmas.[4] C.M.'s sadness was brought to the juvenile court's attention through mother's testimony. The court implicitly found this was not enough to demonstrate

---

**4**     Although mother testified that C.M. reported to her that he was sad at Christmas 2022, the reason C.M. felt this way was not explored by mother. Since C.M. did not expressly state why he was sad, we can only speculate as to why C.M. reported being sad. This was not evidence that he would suffer a detriment at the severance of the parent-child relationship. There were no other reports of C.M. displaying sadness or crying during or after interactions with mother.

26.

detriment to the children at the termination of mother's parental rights. Mother further argues on appeal that the absence of C.M. and R.M. from their older siblings' lives caused the older siblings "sadness and emotional damage." The question before the juvenile court was the best interests of C.M. and R.M., not the emotional state of mother's older children. In addressing this point, the court noted it had no jurisdiction to order the older siblings' father to allow sibling visitation, which did not occur during these proceedings, and unequivocally found that C.M.'s and R.M.'s sibling bond with their older siblings did not exist.[5]

Mother's depiction of her bond with the children focuses only on their most positive interactions. The court acknowledged there were positive aspects in the parent-child relationship. Mother ignores evidence showing that, for both children, the bond was not as deep as she contends.[6] R.M.'s bond to mother was minimal. C.M.'s

---

[5] There was no evidence in the record of sibling visits between the children and their older siblings. These may have occurred during the beginning of the dependency proceedings while the children were staying with the relative care provider. If such visitation occurred, it had stopped well before mother's reunification services were terminated.

[6] We do not see *In re E.T.* (2018) 31 Cal.App.5th 68, cited by mother, as analogous to the instant action. In *E.T.*, twins were removed from mother's custody. The twins were placed with their godparents who sought to adopt them. At one point in the dependency, mother was able to reunify with the children with family maintenance services but self-reported a relapse, lost custody of the children, and eventually reunification services were terminated. Mother maintained regular visitation. The children were sad, withdrawn, and might act out after visits with mother. The visits themselves were described as therapeutic and some of the children's negative behaviors were due to their separation from mother. (*Id*. at pp. 73, 76.) *E.T.* held that the juvenile court erred in failing to apply the beneficial parent-child relationship exception to adoption as the preferred plan. (*Id*. at p. 77.)

The facts here resemble *E.T.* in that mother clearly loves her children. Mother's visits with the children, however, were never described as therapeutic. Neither C.M. nor R.M. acted out after the end of visits with mother and adjusted well to their lives with the prospective adoptive parents. Unlike the children in *E.T.*, C.M. and R.M. were not as deeply attached or bonded to mother. Their visits with mother were pleasant and fun, but

bond to mother was more significant than R.M.'s, but C.M. clearly viewed people other than his mother as his parents and was not emotionally distraught when visits ended. "Interaction between natural parent and child will always confer some incidental benefit to the child." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "The relationship arises from day-to-day interaction, companionship and shared experiences. The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid.*)

The juvenile court described as persuasive C.M.'s reports to his social workers describing the care providers' home as his home. In evaluating whether to apply the beneficial parent-child relationship exception to a permanency plan of adoption, the court concluded the nature of the parent-child relationship was not such that it would be detrimental to the children to terminate that relationship in favor of the preferred plan of adoption.

After a court finds a child adoptable and reunification has failed, as occurred here, it is the parent's burden to show exceptional circumstances exist. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 574; *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1345.) There was no evidence at the section 366.26 hearing that severing the mother's parental bond would cause detriment to either child, or that there were exceptional circumstances justifying the beneficial parent-child relationship exception to adoption as the preferred permanent plan.

The juvenile court considered the nature of the bond between the mother and the children. C.M. was older and had memories of living with mother. R.M. was too young to have such memories. The court observed that both social workers fairly examined the strengths and weaknesses in mother's bond with the children. The court evaluated the

_____

discontinuing visits would not be detrimental to either child. We find the facts and holding of *E.T.* inapposite to this case.

strength of C.M.'s attachment to mother, noting that C.M. called his prospective adoptive family his parents. This finding is supported by the social worker's observation that C.M. did not appear to suffer trauma when leaving mother after visits and gave his care providers hugs and kisses upon returning from the February 9, 2023 visit. The court recognized the children enjoyed visits with mother. The court found that mother had failed to meet her burden that the detriment of severing the relationship outweighed the benefit of adoption to the children.

There was substantial evidence in the record to support the juvenile court's findings concerning the first two elements in establishing the beneficial parent-child relationship exception. Although mother had regular visitation with the children, she did not show that the children had a substantial, positive, emotional attachment to her—the kind of attachment implying the children would benefit from continuing the relationship. (*Caden C.*, *supra*, 11 Cal.5th at pp. 631, 639–640.) In making these findings, the court did not rely on improper criteria as did the Court of Appeal in *Caden C.* (*Id.* at p. 642.)

The third element to establish the beneficial parent-child relationship exception is that mother had to show terminating the attachment would be detrimental to the children, even when balanced against the countervailing benefit of a new, adoptive home. (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) The mother also failed to establish this element. The juvenile court found there would be no detriment to the children and that they were likely to be adopted. The court severed mother's parental rights and chose the preferred permanent plan of adoption. The court found that the children had bonded with their current care providers, viewed them as their parents, and would gain stability and permanency through adoption. In making these findings and orders, the court did not abuse its discretion, nor did it act in an arbitrary, capricious, or patently absurd manner. (*Id.* at p. 641.)

29.

**DISPOSITION**

The orders of the juvenile court, including the order to terminate mother's parental rights, are affirmed.